124 F.3d 206
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel J. WALETZKI, Defendant-Appellant.
 No. 95-3726.
 
 Seventh Circuit.
 Sept. 4, 1997.
 Appeal from the United States District Court for the Western District of Wisconsin, No. 94 CR 72; Barbara B. Crabb, Judge.
 
 
 1
 Before Hon. RICHARD A. POSNER, Chief Judge Hon. DANIEL A. MANION, Circuit Judge Hon. ILANA DIAMOND ROVNER, Circuit Judge
 
 ORDER
 
 2
 A jury found defendant Daniel J. Waletzki guilty of bank robbery by use of a dangerous weapon, 18 U.S.C. § 2113(a) and (d), and use of a firearm during a crime of violence, 18 U.S.C. § 924(c)(1), and defendant was sentenced to 341 months' imprisonment.
 
 
 3
 On appeal, defendant argues that his initial detention was actually an arrest without probable cause; that the district court should have suppressed all statements he made to police while held in the squad car since he was not given Miranda rights; that the police officers did not observe a gun in plain view on the seat of defendant's car; that the court failed to suppress all evidence stemming from the police officers' illegal conduct in listening, without probable cause or a warrant, to the contents of an unlabeled audio cassette tape found in defendant's car; that statements made by defendant to detectives on the day following his arrest should have been suppressed; that the district court misread a jury instruction; that it was error to permit a bank employee to make an in-court identification of defendant as the bank robber; and that the district court abused its discretion in granting the government's request to have defendant wear handcuffs and leg shackles during a pre-trial evidentiary hearing. The defendant has appeared pro se during both the jury trial and on appeal, and this court appointed an amicus curiae to represent him.
 
 
 4
 On January 10, 1994, a man dressed in a ski mask and jogging suit entered a bank in Madison, Wisconsin, announced a robbery, fired a shot into the ceiling, and stated, "I have a police scanner and I will know if you set off an alarm." The robber took approximately $44,000, including eleven $20 bills from which the bank had recorded serial numbers and which were used by the bank as "bait money." The robber then left the bank in a red Pontiac Grand Am, and a witness wrote down the car's license plate number.
 
 
 5
 Apparently the Madison police hit a dead end in their investigation of the robbery; at least, there is nothing in the record indicating they significantly progressed after this time, until February 15, 1994. On that day, the Madison police were contacted by the Minneapolis police, reporting that they had arrested defendant, who had recently been released from prison after serving nine years for bank robbery. The arrest was for violating a local ordinance prohibiting the carrying of a loaded, uncased handgun in the passenger compartment of a vehicle (later the charge was changed to being a felon in possession of a gun). The police thought the car might be stolen, or perhaps had been involved in a hit-and-run accident; they also surmised that Waletzki may have been involved in a burglary or robbery. But more significant to the Madison police was that in the car the Minneapolis police found an unlabeled cassette tape, which they listened to and discovered what they thought sounded like police radio traffic following a robbery in Madison. The Madison police joined (and soon took over) the Minneapolis investigation, and Waletzki was then separately charged with the Madison bank robbery.
 
 
 6
 Prior to trial, a magistrate judge recommended that all of defendant's suppression motions be denied, except: (1) the motion to suppress statements made in response to questions by the arresting police officers while defendant was held in the squad car, since no Miranda rights were given, and (2) the motion to suppress the audio cassette tape containing police radio transmissions, on the basis that the police failed to obtain a warrant before listening to the tape. The district court adopted the findings and recommendations of the magistrate judge.
 
 Initial Detention
 
 7
 Waletzki begins by attacking his initial detention. See Terry v. Ohio, 392 U.S. 1 (1968). Officer Lopez of the Minneapolis Police Department stated in a report that he and his partner, Officer Perkins, were dispatched after the department had received a telephone call from a resident of 4322 15th Avenue, reporting that a car was parked "in the driveway" of 4323 14th Avenue, "sticking out into the alley." The front end of the car had "severe damage," the vehicle "was still running," and the neighbor thought "it was possibly a stolen motor vehicle." Officers Perkins and Lopez proceeded to that location, and as they walked toward the car, a maroon Ford Taurus, they saw defendant sit up in the left rear seat, with "a startled look on his face," slid to the opposite side of the car, and opened the car door. Perkins thought defendant "may be trying to get away." See United States v. Quinn, 83 F.3d 917, 921-22 (7th Cir.1996) (recognizing that flight from a police officer is a relevant and probative factor in establishing reasonable suspicion, although it is not necessarily enough standing alone). Because Waletzki's actions appeared elusive, the officers drew their weapons and ordered him to stand against the garage, but he "was very reluctant in doing so and his eyes glanced around as if looking for a place to run." As a result, the officers handcuffed Waletzki and placed him in the rear of the squad car.
 
 
 8
 Officer Lopez questioned Waletzki, who said he owned the car and had bought it from a Chinese couple. Lopez ran a check on the car, finding that the registered owner (a man with an Oriental-sounding name) had no listed telephone number and therefore could not be reached to verify ownership. In the meantime, Officer Perkins walked over to the car, looked through the driver's window, and saw the barrel of gun showing under an armrest in the front seat. Perkins and Lopez then officially advised defendant that he was under arrest.
 
 
 9
 The initial detention of Waletzki was based on reasonable suspicion and was proper in scope. The cumulative factors articulated by the officers--Waletzki's sleeping in the back seat of the oddly-parked, damaged car with the engine still running, a car unknown to the neighbors, and particularly the officers' perception that Waletzki was going to try to flee--amounted to reasonable suspicion and justified briefly detaining Waletzki for further investigation. Cf. United States v. Cervantes, 19 F.3d 1151 (7th Cir.1994) ("No right of privacy (or of property) of Cervantes' was invaded by the search of his car; he had sacrificed his vehicular privacy by engaging in conduct that gave the police ample grounds for believing that he was using the vehicle for drug trafficking.").
 
 
 10
 Waletzki argues that even if it was initially permissible to inquire into the car's precarious position, the encounter swiftly escalated into a de facto arrest because the officers drew their weapons, handcuffed him, searched his pockets and the contents of his wallet, and placed him in the squad car for as many as 15 minutes to question him, before finally arresting him. If the initial detention was actually an arrest, it was without probable cause since the police had not yet seen the handgun. See Terry v. Ohio; United States v. Finke, 85 F.3d 1275, 1279 (7th Cir.1996).
 
 
 11
 Even without probable cause for arrest, the police officers were permitted to draw their weapons and use handcuffs in a situation like this, where the officers were investigating a possibly stolen vehicle which initially appeared empty, had the engine running, was parked precariously, and had the front end severely damaged, then saw someone sit up in the back of the car and appear to try to flee from the officers. The situation confronting the officers was permeated with exactly the type of unpredictability and potential for violence which the Constitution does not require street officers to ignore. See, e.g., Maryland v. Wilson, 117 S.Ct. 882, 885 (1997).
 
 
 12
 We find that there was nothing done by the police here that escalated the detention into an arrest, and therefore probable cause was not needed for this initial detention. See California v. Hodari D., 499 U.S. 621, 624-27 (1991); United States v. Wilson, 2 F.3d 226, 230 (7th Cir.1993). Moreover, we note that had Waletzki not appeared furtive and elusive, the officers easily would have had the opportunity to glance into the parked car and would have immediately noticed the handgun sitting on the front seat; in fact, anyone strolling by the car could have seen the gun.
 
 Plain View Observance of Gun
 
 13
 Waletzki argues that if the police had not violated his Fourth Amendment rights by permitting the stop to immediately escalate into an arrest, for which they had no probable cause, they would never have seen the handgun. This makes little sense, because even if Waletzki did not wake up or did not appear elusive, the officers still would have seen the handgun sitting on the front seat when they asked Waletzki if the car belonged to him.
 
 
 14
 Waletzki also contends that the police officers lied, that his gun was not in plain view on the front seat of his car. Waletzki testified at the pretrial suppression hearing that he sat in the squad car with Lopez, verifying identification information, while he watched Perkins return to the car:
 
 
 15
 I noticed Officer Perkins open the front door of my vehicle and start to search inside. I had a satchel of some type, a sports bag on my front seat.... And it was on my front seat, and it would have been covering the armrest. There's no way a person viewing from the passenger's window could have seen the armrest, much less anything underneath it. I seen the officer go in there and rummage through there. And the reason I was so interested in this is because I knew I had a handgun in that car, and I knew the officer was going to find it eventually.... I was just surprised it took so long.
 
 
 16
 Defendant then admitted to the officers that the gun belonged to him. We find that the district court was entitled to find the testimony of the police officers credible. See United States v. Willis, 37 F.3d 313, 316 (7th Cir.1994).
 
 
 17
 Waletzki adds that even if the gun was in plain view, the driveway was private property where the police had no right to be. However, the car was parked partially in a public alley, and neither the neighbor who called the police nor the woman who lived in the house connected to the private driveway knew whose car it was, or why it was seemingly abandoned in that location. See United States v. Evans, 27 F.3d 1219, 1228-29 (7th Cir.1994) (collecting cases).
 
 
 18
 Statements Volunteered to Arresting Officers
 
 
 19
 After discovering the gun in plain view, the police had probable cause to arrest for violating a local ordinance prohibiting the carrying of a loaded, uncased handgun in the passenger compartment of a vehicle, or for defendant's being a felon in possession of a gun. Waletzki argues that he made several remarks that should have been suppressed. Officer Lopez reported that the defendant "spoke freely without my asking him any questions, and he stated that we were lucky we caught him sleeping. If we would have came upon him when he would have been awake, he stated he would have shot us until his magazines were empty. He told us that he had just gotten out of federal prison in Terre Haute, Indiana, where he had served time for bank robbery. He told us he knew it was [a] federal crime to have a handgun and that he wished it wasn't us that had caught him, but detectives." In addition, defendant "displayed a great deal of anger about going back to prison and stated that even though it wasn't our fault, if he had the chance he would kill as many police officers as he could."
 
 
 20
 The Fourth Amendment argument raised by the amicus on behalf of Waletzki fails for the reasons already explained: Waletzki's initial detention was proper, and the arrest minutes later was supported by plain view of a gun sitting on the front seat of the car.
 
 
 21
 Without regard to the Fourth Amendment's differentiation between an investigative detention and a formal arrest, see United States v. Burns, 37 F.3d 276, 280 (7th Cir.1994), it is of Fifth Amendment significance that the police officers failed to inform Waletzki of his rights during the custodial detention. See Miranda v. Arizona, 384 U.S. 436, 478 (1966); United States v. Smith, 3 F.3d 1088, 1097-98 (7th Cir.1993). Waletzki was successful in convincing the district court that the police officers violated his constitutional rights by failing to advise him of his rights under Miranda when they questioned defendant in the squad car. (The government does not challenge this finding.) Consequently, any statements Waletzki made to the police at that time in response to questioning were suppressed. See Miranda, 384 U.S. at 478. However, the remarks Waletzki so imprudently taunted the officers with were not suppressed. We agree with the district court that these statements could properly be admitted into evidence at trial because they were volunteered and not made in response to the officers' questions.
 
 
 22
 Our finding is not altered by Waletzki's untenable argument that the remarks were indirect responses to the officers' routine questions because "but for the unlawful detention he never would have become upset or 'angry' and the inculpatory statements would never [have] been uttered." The voluntariness of the statements will not be determined based on his belated characterization of his subjective intent in making the remarks. The magistrate judge who heard the motions to suppress nicely summed up Waletzki's tactics:
 
 
 23
 Indeed, Waletzki perhaps had a little too much experience with the criminal justice system and the law for his own good. Throughout this court's extensive interaction with Waletzki, both in open court and in writing, Waletzki has displayed both garrulousness and a dogged belief that he is a legal maven. I have no doubt whatsoever that Waletzki volunteered to the officers that he would have shot them until he was out of bullets, and the he had expected to be caught by detectives rather than beat cops. Based on what Waletzki told the detectives the next day about his arrest being faulty, I surmise that Waletzki offered his statements to Officers Perkins and Lopez both because he mistakenly believed they could never be used against him and because he just couldn't stop talking.
 
 
 24
 We find no error in permitting the jury to hear these volunteered statements.
 
 
 25
 Waletzki also argues that his telling the police that he had recently been released from prison was a direct response to their questions, and that they would not have considered his possession of a gun a crime if he had not provided that information. However, Waletzki was not initially arrested for being a felon in possession of a gun. Instead, he was arrested for violating a Minneapolis ordinance prohibiting carrying an uncased gun, a valid charge notwithstanding his characterization of the ordinance as "some unknown Minneapolis law."
 
 
 26
 We also note that no physical evidence was obtained as a result of the Miranda violation, since the gun was discovered by Perkins independently of any questioning by Lopez.
 
 Search of Car and Seizure of Scanner
 
 27
 Waletzki's argument that the police would never have found the police scanner, which he portrays as "critical evidence because it tied Waletzli directly to the Madison bank robbery," also must fail because it rests entirely on the argument that the initial detention was an arrest without probable cause, an argument we have already rejected. The scanner was properly seized at the scene of the arrest pursuant to a search incident to Waletzki's arrest, see New York v. Belton, 453 U.S. 454 (1981), or an inventory search following his arrest, see Colorado v. Bertine, 479 U.S. 367, 372 (1987).
 
 Search of Car and Listening to Tape
 
 28
 Waletzki next challenges, under the Fourth Amendment, the district court's refusal to suppress (indeed, even to consider the motion to suppress) the fruits of the police officers' illegally listening to the cassette tape found in the car. Under the standard of review for the denial of a motion to suppress evidence obtained in an inventory search, we review findings of fact for clear error, giving "due weight to inferences drawn from those facts by resident judges and local law enforcement officers," and review questions of law and mixed questions of law and fact de novo. Ornelas v. United States, 116 S.Ct. 1657, 1663 (1996). The government bears the burden of showing by a preponderance of the evidence that its evidence is untainted. Nix v. Williams, 467 U.S. 431 (1984); Alderman v. United States, 394 U.S. 165, 183 (1969).
 
 
 29
 Waletzki argues that there was "no other basis, besides the contents of said cassette tape, that would have caused arresting officers, or arresting police agency, to suspect the defendant had ever even been to Madison, Wisconsin much less ever committed a crime there."
 
 
 30
 At the scene, following Waletzki's arrest, Officer Lopez listened briefly to the unlabeled cassette tape, recognizing police dispatch transmissions, but unsure of their geographic origin. He testified at the pre-trial evidentiary hearing in response to Waletzki's questioning:
 
 
 31
 Q * * * [Y]ou went yourself and conducted a search of some type on the vehicle, is that not correct?
 
 
 32
 A I went up with Officer Perkins and helped him carry things from the vehicle to put in the rear of the squad car.
 
 
 33
 Q Did you come across a cassette tape?
 
 
 34
 A Yes.
 
 
 35
 Q Did you listen to it?
 
 
 36
 A Yes, I did.
 
 
 37
 Q Why did you listen to the cassette tape?
 
 
 38
 A To see what was on it.
 
 
 39
 Q So you consider that to be part of your search of the vehicle. What were you looking for, may I ask?
 
 
 40
 A See if there was any evidence on there to lead us to believe a crime had been committed.
 
 
 41
 Q But you already knew a crime had been committed. You found the gun, correct?
 
 
 42
 A Any further crimes.
 
 
 43
 (4/14/95 hearing; Tr. 4142.) Officer Perkins testified at the same pre-trial hearing that after Waletzki was placed under arrest, Perkins began "an inventory search of the defendant's vehicle. I then proceeded to go through the vehicle and recovered an assortment of items from the car."
 
 
 44
 Q Was that inventory search pursuant to some sort of policy?
 
 
 45
 A Correct. It is a search incident to arrest. At the time the defendant was under arrest and it is per our department manual and we do it for safekeeping purposes.
 
 
 46
 (4/14/95 hearing; Tr 47.) The Minneapolis Police Department manual instructed officers to perform vehicle searches in certain limited circumstances:
 
 9-205 Vehicle Searches
 
 47
 Vehicles may be searched without a warrant in the following circumstances:
 
 
 48
 1. Probable cause exists to believe that the vehicle contains the fruits or instrumentalities of a crime, contraband, or weapons with which to assault officers. In such cases, all parts of a vehicle may be searched.
 
 
 49
 2. When an officer takes the driver into custody and tows the vehicle, the officer shall conduct an inventory search.
 
 
 50
 3. When an officer stops an occupant of a vehicle and has probable cause to believe that he/she has been involved in criminal activity and may be armed, the occupant may be searched and portions of the vehicle where a weapon might be accessible may be searched.
 
 
 51
 4. When a vehicle is unoccupied and towed by police order, an inventory search shall be conducted.
 
 
 52
 5. When a vehicle is towed to another location because of existing conditions which make it unsafe or impractical, it may be searched without a warrant. However, if time and circumstance allow, a search warrant shall be obtained.
 
 
 53
 After the inventory search, the officers waited for the tow truck to arrive. Later, at the police station, Lopez again listened to the tape as the inventory search continued. He believed that the police calls were from either Duluth, Minnesota, or Madison, Wisconsin. He made Department of Transportation inquiries on the plate numbers mentioned on the tape and determined they were from the Madison area. Later, other Minneapolis and Madison police officers listened to the audio-cassette tape; a warrant was never sought. The district court found that this was a violation of the Fourth Amendment. The government does not contest the finding, and consequently we limit our discussion to the contested issues in this appeal, particularly the link between the tape's contents and the evidence used at trial.
 
 
 54
 As a result of the district court's suppression of the tape, the jury heard nothing about the discovery of the tape or its contents. Nevertheless, defendant offers a "fruit of the poisonous tree" argument that the content of the tape was the only thing that linked him to the Madison bank robbery.
 
 Waiver
 
 55
 Before considering the merits of the issue, we must determine whether Waletzki has waived it. Prior to trial, defendant's pro se motions to suppress included a generally-worded motion seeking to suppress the cassette tape and its contents, which was granted. Subsequently, the government sent defendant a letter notifying him that it intended to use the contents of the tape. The government agreed that it would attempt to provide Waletzki with a transcript of the tape. On the morning trial started, defendant filed a "motion to dismiss" arguing that "the illegal search and seizure of the contents of the cassette tape ... tainted all facts/evidence discovered by process initiated by the unlawful search." The district court refused to consider the motion, stating that defendant should have raised it earlier. The district court apparently distinguished between the earlier motions to suppress which focused on the tape itself and its contents, while the later "motion to dismiss" sought to suppress the "fruits"--everything the police learned after hearing the tape.
 
 
 56
 We do not believe that Waletzki waived the issue. The pre-trial motions and arguments made to the magistrate judge were specific enough to indicate he wished to suppress more than the contents of the tape. The link to Madison was the obvious key that Waletzki wanted suppressed, not the mere fact that he had recorded, or the police had listened, to the radio transmissions.
 
 
 57
 We pause to note that the problem of not adequately articulating a basis for a crucial objection, like too many other questions raised in this case, highlights the potential harm facing a defendant representing himself in criminal proceedings, particularly those with complex evidentiary issues, as he persistently refuses all assistance even from standby counsel. In any event, we proceed to the merits of the issue.
 
 
 58
 Given the position taken by the government on appeal, we will assume that the tape was listened to as part of an inventory search, see Colorado v. Bertine, 479 U.S. 367, 372 (1987), although prior to trial the government made vague references to a possible search incident to arrest, see New York v. Belton, 453 U.S. 454, 460-61 (1981), or a search where no Fourth Amendment justification was necessary due to an absence of any legitimate expectation of privacy, see California v. Carney, 471 U.S. 386, 391 (1985). We also assume without deciding that by listening to the tape, the proper scope of the inventory search was exceeded. See South Dakota v. Opperman, 428 U.S. 364, 375 (1976).
 
 
 59
 Thus, we do not find it necessary to decide the applicability of Whren v. United States, 116 S.Ct. 1769, 1773 (1996), which may indicate that as a result of its holding that all inquiry into pretextual motives of the police officers performing a search has perhaps died, or at least been seriously undermined. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.4 (3d ed.1997 pocket part) ("The effect of Whren, then, is that (with certain exceptions ... ) the pretext doctrine has disappeared from Fourth Amendment jurisprudence"). It is not yet clear whether the Supreme Court will extend Whren to cases where no probable cause exists[1], and the illegal search is performed during an inventory search. Cf. Whren, 116 S.Ct. at 1774 ("we never held, outside the context of inventory search ... that an officer's motive invalidates objectively justifiable behavior") (emphasis added). See also United States v. Williams, 106 F.3d 1362, 1365 (7th Cir.1997) ("Post Whren, pretext is devoid of its traditional sense; what remains is to look for the absence of an objective rationale for a search"); Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.4 (3d ed.1997 pocket part) ("it would seem [after Whren] that certain pretext-type claims are still viable when, as the Court put it, the case involves police intrusion without the probable cause that is its traditional justification," for example in the inventory searches distinguished by the Court in Whren ) (internal quotes omitted), discussing Scott v. United States, 436 U.S. 128, 138 (1978) ("Subjective intent alone ... does not make otherwise lawful conduct illegal or unconstitutional.").
 
 
 60
 In any event, this circuit has consistently held, even before Whren, that the police officers' motive in performing a search is not relevant. See, e.g., Cervantes, 19 F.3d at 1153-54 (where stop of car was admittedly a ruse, even if officer lied about gun having been in plain view in car, the gun would have turned up in the search incident to legitimate Terry stop; the "exclusionary rule is intended to protect the privacy and property rights of the citizen, rather than to punish law enforcement officers for trickery, deceit, or even telling lies under oath"); United States v. Trigg, 925 F.2d 1064, 1040 (7th Cir.1991) (this circuit applies a "purely objective inquiry in evaluating the reasonableness of a particular police activity"); United States v. Rivera, 906 F.2d 319, 321 (7th Cir.1990) (question is whether officer "could" arrest, not whether he "would" have arrested absent the improper subjective intent).
 
 
 61
 Thus, we consider the propriety of admitting into evidence the fruits of the "search" of the tape without regard to the subjective intent of the officers who listened to the tape.
 
 Inevitable Discovery
 
 62
 Under the inevitable discovery doctrine, illegal search does not prevent the introduction of evidence that eventually would have been located since "there is no nexus sufficient to provide a taint." Nix v. Williams, 467 U.S. 431, 448 (1984). Waletzki argues that the discovery of his connection to the Madison bank robbery was not inevitable, absent the tape and its revelations.
 
 
 63
 It is not uncommon, and does not necessarily imply a constitutional violation, for police officers who have just arrested a person to extend the tentacles of the investigation to seek evidence not only for the offense for which the person was arrested, but also for unrelated offenses. Cf. McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991) (investigating new or ongoing criminal activity for which an accused has not been charged, does not violate Sixth Amendment). Police officers do not--indeed, the public would not want them to--close their eyes to obvious crime-related information placed in front of them just because it is unrelated to the offense charged. In this case, for example, the record is quite clear that beginning at the time of his arrest, the police suspected Waletzki had been involved in a robbery. True, he was arrested and held for a gun charge, and he had great hopes that the investigation would not go beyond the gun possession:
 
 
 64
 [M]y intent in this interview was to confess to ownership of this gun in my hopes that the city of Minneapolis and the state of Minnesota would grab the case, being an open-and-shut case, and process it, and I would be convicted of the crime to my hopes of preventing, barring the federal government from charging me under a more severe penalty on the federal level.
 
 
 65
 But too many facts pointed to a robbery of something, somewhere. The arresting officers wondered about the electrical equipment found in the car ("what appeared to be expensive video and audio equipment"), and wondered if the car itself was stolen. Upon arriving with Waletzki at the police station, Officer Perkins told his boss, Sgt. Robert Thompson, that he suspected defendant had been involved in a robbery. Thompson replied that he remembered defendant's name because of his own involvement in investigating defendant's "bank robbery some years past." Significantly, he also recalled that Waletzki had used a police scanner in that robbery. A subsequent check of Waletzki's criminal history verified that he had recently been released from federal prison after serving nine years for that bank robbery. So the discovery soon thereafter that the tape's contents seemed to point to a bank robbery was no surprise to the Minneapolis police.
 
 
 66
 This tentative, probing extension of an initial investigation into an arrestee's possible criminal behavior might especially be true where the police recognize the defendant as a prior felon. Cf United States v. Feliciano, 45 F.3d 1070, 1074 (7th Cir.1995) ("Knowledge of ... recent relevant criminal conduct, while of doubtful evidentiary value in view of the strictures against proving guilt ... by a predisposition based on past criminal acts, is a permissible component of the articulable suspicion required for a Terry stop."). See also United States v. Causey, 834 F.2d 1179, 1181 & n. 4 (5th Cir.1987) (en banc ) ("Nor is it suggested that anything improper occurs when police officers question a suspect who is under arrest for one crime about others of which he may be guilty or have knowledge," especially given the "common and general knowledge that a high percentage of the crime in our society is committed by a relatively small number of multiple offenders").
 
 
 67
 Moreover, even without the Madison link, the first interview of Waletzki by Thompson and Gerfen (prior to telling Waletzki that Gerfen was from Madison) was filled with facts that distinguished this case from a straightforward felon-in-possession case. Waletzki reported that since his release from prison a month earlier he had been staying at motels, but could not remember where; he had been using phoney names, but could not remember what they were; he had been robbing dope dealers using a gun, but could not remember when or where or who; he had bought a gun in Duluth but could not remember where, or the seller's name; he had been buying a great deal of expensive electronic equipment with cash, but could not remember from which mall; and had bought a police scanner a week earlier, but could not remember where. Red flags abound.
 
 
 68
 Of course, suspecting that Waletzki had committed a robbery does not mean the Minneapolis police would have even made the connection to a bank robbery in Madison, Wisconsin. It is true that the tape narrowed the geographical area down considerably, first to Duluth, Minnesota or Madison, Wisconsin, and then narrowed further (after license plate numbers were run through the computer), to Madison. But there were several other trails leading to Madison.
 
 
 69
 Before exploring those trails, we note that the detectives' notifying Waletzki that they had listened to the tape and that Det. Gerfen was from Madison in no way prompted Waletzki to collapse and confess to the bank robbery; they might as well have not mentioned Madison.[2] Waletzki merely insisted that he had only been to Madison on December 10, 1993, when he first met his girl friend Christine immediately after his release from federal prison in Indiana; that he had loaned his gun to someone, so matching it to a bullet fired during the bank robbery was meaningless; that photographs of the robber would not identify him; and that he liked to use the microcassette recorder to record from the police scanner.
 
 
 70
 Waletzki admits that the scanner alone--even without the tape--was "critical evidence because it tied Waletzki directly to the Madison bank robbery." (Brief of amicus curiae, p. 26.) And he readily concedes that the scanner alone, without the tape, "distinguished this crime from an ordinary armed bank robbery," thus pointing to Waletzki. (Brief of amicus curiae, p. 30.) Waletzki also concedes that the firearm is "powerful evidence" because "it provided the critical link between the defendant and the Madison bank robbery," id, and of course finding the gun had nothing to do with the cassette tape.
 
 Cameron Identified
 
 71
 Cameron obviously played a key role in the case against Waletzki. Waletzki contends that it was the tape that spurred the police to locate and question Cameron, who led them to the evidence which ultimately convicted him of the Madison crime. We think it a certainty, however, that the Minneapolis police would have located and interviewed Cameron. Although defendant initially refused to give the police her last name, defendant's parole officer provided her name, address and phone number to the Minneapolis police. Notably, only a few weeks earlier the parole officer had met with Waletzki at Cameron's home, so the police would have known that she was more than a remote acquaintance and someone they would want to interview. Moreover, Waletzki telephoned her from the Minneapolis jail and she visited him several times immediately after his arrest.
 
 Knew What Questions to Ask
 
 72
 Waletzki goes on to argue that without the tape's link to Madison, the police would not have known what questions to ask Cameron. In some respects the inquiry in a case such as this, because the discovery of information comes from a live witness, is what Cameron "inevitably" would have done if the police had never heard the tape--not what the police would have done. We think the evidence quite clear that, while some of the initial information came from Cameron, the police proceeded in just the manner one would expect, even absent the tape's limited information. See Abel v. United States, 362 U.S. 217, 226-27 (1960) (true purpose in arresting defendant was not to determine deportability but rather to obtain evidence for a criminal espionage investigation; however, Court held that "while the first information that came to them concerning [Abel] * * * was furnished by the FBI--which cannot be an unusual happening--the proceedings taken by the Department differed in no respect from what would have been done in the case of an individual concerning whom no such information was known to exist"). Cf. Whren, 116 S.Ct. at 1775 (discounting Abel on other grounds).
 
 
 73
 As we have already stated, the police in Minneapolis knew from the moment of the arrest that they suspected Waletzki might be involved in a robbery. They also knew he had been convicted of bank robbery. It would have been incredible if they did not question Cameron about a possible bank robbery--whatever its geographical location. Thus, we think that questioning Cameron about whether Waletzki had been involved in recent robberies was inevitable. See United States v. Fialk, 5 F.3d 250 (7th Cir.1993) (as a result of illegal search, defendant arrested for murder; arrest was reported in the news, which social security agent heard, triggering agent's investigation of why victim--after murder--had still been receiving and cashing social security payments; court finds latter investigation was not tainted, since at some point, as a matter of routine, the social security agent would have checked on the cashing of the deceased's checks and discovered defendant's fraud).
 
 
 74
 Moreover, a live witness differs considerably from physical evidence discovered as the result of an illegal search. Cameron's information, unlike a piece of physical evidence, provided even further attenuation between the radio transmissions on the tape and the evidence leading to Waletzki's conviction for bank robbery. See generally Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4 (text accompanying nn. 370-404) (3d ed.1997 pocket part). This is especially true since Cameron's identity was known to the Minneapolis police, and her relationship with Waletzki was known through the parole officer. See United States v. Ceccolini, 435 U.S. 268, 27677 (1978) ("both the identity of Hennessey and her relationship with the respondent was well known to those investigating the case" notwithstanding fact that her testimony could be traced back to the illegal search). The increased attenuation stems from the fact that, unlike a physical object, Cameron was able to exercise her free will in deciding to reveal her knowledge about the bank robbery and to hand over the cash, including the bait money, given to her by Waletzki. Cf. United States v. Schaefer, 691 F.2d 639 (3d Cir.1982) (decision of witness to testify was result of decision to accept grant of immunity, not coercion). It is of some significance that time had passed, nearly 24 hours, between the first interview when Cameron chose not to cooperate with the police, and the second interview. During this time, she had even passed the money on to her mother, where the police undoubtedly would not find it, yet she still chose to reveal its hiding place to the police. See Ceccolini, 435 U.S. at 276-77 ("the degree of free will exercised by the witness is not irrelevant in determining the extent to which the basic purpose of the exclusionary rule will be advanced by its application").
 
 
 75
 Moreover, it would make little sense to render Cameron forever unavailable to police inquiries because a Fourth Amendment violation in listening to an unmarked cassette tape, played during an inventory search, initially caused the police to pose questions to her about a connection between Waletzki and Madison. See Ceccolini, 435 U.S. at 277-78 ("such exclusion would perpetually disable a witness from testifying about relevant and material facts, regardless of how unrelated such testimony might be to the purpose of the originally illegal search or the evidence discovered thereby.... In short, since the cost of excluding live-witness testimony often will be greater, a closer, more direct link between the illegality and the kind of testimony is required."); United States v. Friedland, 441 F.2d 855, 859, 861 (2d Cir.1971) (Friendly, J.) (illegally obtained information is sometimes used to "spur" police to investigate a crime "they might otherwise have dropped," but "to grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds").
 
 
 76
 Waletzki argues that Cameron chose not to cooperate until the police "threatened" her with information (obtained from the tape) that Waletzki might be linked to a Madison bank robbery. Cameron was quite clear, however, that the officers' revealing that they had evidence linking Waletzki to Madison had no effect on her decision to cooperate. Instead, it was their informing her that she could be charged as an accessory. She testified: "[W]hen I learned that I could have been charged with the bank robbery itself, ... that's when I started telling them more what I knew."
 
 
 77
 Waletzki also argues that it was coercion to "threaten" Cameron with being charged as an accessory to the bank robbery or other crimes he might have committed. This is standard police procedure which had nothing at all to do with the cassette tape's radio transmissions. Moreover, the procedure makes sense and in fact is in the interviewee's best interest; the absence of such a warning would be more remarkable. We will not characterize this apprisal as coercion.
 
 
 78
 In addition, courts sometimes refer to an "initial reluctance test," which has been found to be "very difficult to administer." Pitler, " 'The Fruit of the Poisonous Tree' " Revisited and Shepardized, 56 Calif. L.Rev. 579, 623 (1968) ("After the police find the witness, may they 'persuade' him to speak? Is the method of persuasion a factor? How are the real reasons underlying the witness' decision to speak discovered?"); Ruffin, "Out on a Limb of the Poisonous Tree: The Tainted Witness," 15 U.C.L.A. L.Rev. 32, 55 (1967) ("But in what acceptable sense can it be said that the will of this hapless witness has intervened? I can think of no better illustration of how rigid conceptions of causation and as 'para-mechanical theory of the mind' can lead to results long since rejected by physicists and psychologists"). See generally Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4, text accompanying fn. 387 (3d ed.1996). So we hesitate to wander further into the murky question of what subjective factor prompted Cameron to cooperate. This is particularly appropriate where the radio transmissions obtained from the tape in no way implicated--or even mentioned--Cameron. Indeed, nothing at all pointed to her involvement in the robbery.
 
 
 79
 Additional support for the attenuation between the tape's link to any Madison-related information provided by Cameron involves the question of what information the Madison police brought with them which the Minneapolis police lacked: the description of the car used by the bank robber (a red Grand Am), the serial numbers of the bait money taken from the bank, and the shell casing fired by the bank robber from his 9 mm handgun. The Minneapolis police already had the gun. And a standard investigation by the Minneapolis police would have uncovered the rental car, since Cameron readily gave this information, long before admitting she knew anything about a robbery. During the first interview, Cameron reported that she had twice rented a car for defendant, and the car rental company's records revealed to the officers that Cameron had rented a red Pontiac Grand Am in early January 1994; Waletzki was listed as the secondary driver. The rental was memorable because the car was returned with a broken window and filled with trash. It had been driven 1160 miles[3] during Cameron's rental period. This information might very well have led the Minneapolis police to Madison. Of course, the information would be meaningless if the Minneapolis police did not know (from the Madison police) that a red Pontiac Grand Am had been driven by a bank robber in Madison the previous month. But given the nature of the untainted information, and the state of today's technology used by law enforcement agencies, it would have been "proper and predictable police investigatory procedure," see United States v. Buchanan, 910 F.2d 1571, 1573 (7th Cir.1990), to put out an inquiry to other police departments within a relatively close geographical area and ask about bank robberies occurring within the short time that Waletzki had been out of prison, involving a red Grand Am, a great deal of cash, a 9 mm gun, and a police scanner. The Minneapolis police, then, would have had access to a significant amount of crucial information, even without the "Madison" link provided by the tape.
 
 
 80
 Further links to Madison, absent the tape's spurring the Minneapolis police to question Cameron about Madison, include evidence from Cameron's telephone records showing a series collect calls from Wisconsin to Cameron's home immediately before and after the bank robbery, and a series of direct calls made from Cameron's phone to Wisconsin during the same period.
 
 
 81
 Also discovered without Cameron's robbery-related admissions, was a police call radio guide for Illinois, Indiana, Kentucky, and Wisconsin, which was found during a search of defendant's apartment in Superior, Wisconsin.
 
 
 82
 The discovery of the bait money held by Cameron is a bit different. It is not clear that, absent the Madison detective's confronting Cameron with many details about the bank robbery, Cameron would have had any reason to turn over the money she received from Waletzki. Yet even if Cameron had not turned over the money, the Minneapolis police would still have quickly learned that Waletzki had access to a great deal of cash. The police executed search warrants on several of Waletzki's residences, including an apartment and several motel rooms where Waletzki had been staying. They found papers indicating that, within days after the bank robbery, Waletzki had opened several checking and savings bank accounts, and numerous receipts for cash purchases and cash transactions. Also, during the inventory search of the car and the property in Waletzki's possession, the police found several receipts for items in which he paid cash, and $200 in cash which he said was from an ATM, despite the fact that he had no ATM card. The police also spoke with the man who sold Waletzki the car and he reported that even after Waletzki paid for the car in cash, he still flashed a two-inch stack of currency.
 
 
 83
 So take away the bait bills, which could possibly (though not certainly) be viewed as evidence tainted by the illegal search of the tape, and there still remains adequate untainted information. See United States v. Johnston, 876 F.3d 589, 594-96 (7th Cir.1989) (Posner, J., concurring) (discussing whether "unlawfully obtained information is nevertheless valid if the lawfully obtained information in the affidavit is sufficient by itself to establish probable cause for the search"; the erosion to the warrant requirement would be only "slight" and would be "offsetting considerations which seem to me, as they have seemed to most other judges in recent years, weightier"). Cf. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920) (Holmes, J.) (the fact that information is obtained by the police in unlawful manner "does not mean that the facts thus obtained become sacred and inaccessible").
 
 
 84
 We conclude that lawful methods of pursuing the investigation would have inevitably led the Minneapolis police to the Madison bank robbery, even without the illegally "searched" tape. Our conclusion is strengthened by the fact that at some point, the "deterrent effect of the exclusionary rule no longer justifies its cost." Brown v. Illinois, 422 U.S. 590 (1975) (Powell, J., concurring). It would make little sense to prohibit the police from relying on any of the information learned from Cameron, since the deterrence purpose must be balanced by "putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Nix, 467 U.S. at 443. See also Fialk, 5 F.3d at 253. In our view, the Fourth Amendment is not meant to punish the police because they were more interested in the investigation of the possibility that Waletzki committed a bank robbery, than the less serious weapons offense for which he was arrested. See Causey, 834 F.2d at 1184 (confession to bank robbery admissible despite fact that police arrested suspect under an old, outstanding arrest warrant for a petty theft charge, intending to question him solely about the bank robbery). The attenuation principles mandate that the taint stop somewhere. The vague radio transmissions on the tape did not, for example, constitute Waletzki's confession, see, e.g., State v. Weber, 471 N.W.2d 187 (Wis.1991) (tape found in car during inventory search reveals defendant's confession to crime of killing sister-in-law two years earlier), or identify the location of the stolen cash. See also United States v. Carsello, 578 F.2d 199 (7th Cir.1975) (FBI first learned information through illegal state seizure of defendant's records, but later federal investigation showing tax fraud was not tainted, as there was little information in the records to help obtain the evidence admitted at trial).
 
 
 85
 At most, the tape led the police in Minneapolis to focus their investigation to Madison. This is not the type of case, for example, where the authorities never suspected a crime had been committed, such as in the "hidden" crime of tax evasion. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4, fn. 47-48 and accompanying text (3d ed.1996) (distinguishing crimes like assault or robbery), citing Gregory v. United States, 231 F.2d 258 (D.C.Cir.1956) (finding no taint to subsequent investigation where police, returning to scene of illegal arrest, discover newspaper clipping referring to an unrelated crime, a robbery, and subsequently engage in thorough investigation which ties defendant to robbery). The tape may have facilitated and hastened the investigation, but the uncovering of links to the Madison bank robbery was inevitable. Because the attenuation between any illegally obtained information and the derivative evidence is so great that Waletzki has been compelled to strain enormously to provide a link, it can hardly be found that police officers will be deterred if further evidence were suppressed. See Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4, text accompanying fn. 273 (3d ed.1996) ("where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by 'sophisticated argument,' exclusion would seem inappropriate. In such a case it is highly unlikely that the police officers foresaw the challenged evidence as a probable product of their illegality; thus it could not have been a motivating force behind it. It follows that the threat of exclusion could not possibly operate as a deterrent in that situation."). The evidence which overwhelmingly established that Waletzki committed the Madison bank robbery was far too attenuated from the police listening to the unmarked cassette tape. We conclude that the "fruits" of the tape argument advanced by Waletzki fails.
 
 Statements to Detectives at Police Station
 
 86
 Defendant contends in his pro se brief that it was error to permit the police officers to testify regarding statements he made during the interview that took place at the police station on the day following defendant's arrest.
 
 
 87
 Thompson described the interview he and Gerfen conducted on February 15, 1994. Waletzki was given his Miranda rights, and then asked whether he wanted to talk about the weapons incident. "He stated the arrest had been no good and he went on to state that the arrest had been effected on private property and the arrest was bogus or no good, something to that effect." He also reported that he had recently been released from federal prison (something the police already knew), and he identified his parole officer. He could not recall names of motels he had been staying at recently; he admitted using phoney names for several weeks; and he said he'd been robbing dope dealers, so "of course" he had been using the gun. He also admitted that he had been using rental cars, and had been buying large items with cash.
 
 
 88
 When the subject of a possible bank robbery was raised by the detectives that, according to Thompson, Waletzki "stood up from the table, pounded his fists on the table, stated this interview was over." Defendant became "very agitated," said he had been partying and using drugs, and was "very confused and under the influence of these controlled substances and requested that we give him a urine test." When Thompson responded that defendant had appeared under control, alert, and able to easily understand every question, defendant "became very irate, jumped up from the chair he had been seated in and smashed his fist on the table that he had been seated at. He demanded at this point to go back to his cell and stated that the interview was over." The interview was then terminated. Defendant later testified:
 
 
 89
 There was also questioning concerning not specifically whether I committed the bank robbery but concerning my being in Madison, whether I had been in Madison. And I believe I told the detectives at that time that I had been in Madison on the 10th of December when I was released from federal prison.... My Miranda rights were read to me....
 
 
 90
 And it was at that time that I had become agitated, because they spoiled the flavor as far as I was concerned, of the interview, by reading me the rights. It just came out of left field. It was like we were having this conversation in which I'm trying to extract information concerning--concerning the bank robbery and whatever, and they're trying to extract information from me.
 
 
 91
 And as far as I was concerned, no Miranda rights had been read yet, and I figured I was on safe ground. All of a sudden out of left field one of them ... had read me my rights. All I remember is the rights being read, and that was just that it sent the flares up, and it sent the signals up. And I said whoa. And that's when I became agitated, and I got very upset, because I saw the whole thing as a trap.
 
 
 92
 And I had at that time demanded counsel.... I used legal terms when I was--or when I made this [demand]. It wasn't just a normal demand. I cited cases.
 
 
 93
 Defendant added: "I was stating all kinds of stuff, you know, and I stated about being intoxicated. I was just throwing laws out left and right and, and--though I was not intoxicated. I was not under the influence of drugs or alcohol at any time during the interview. And then the interview ended."
 
 
 94
 Given this testimony, particularly Waletzki's admitted attempts to craftily manipulate and out-maneuver the detectives, the trial court was entitled to make a credibility finding that the detectives had in fact properly advised Waletzki of his rights and had not coerced him. Thus, defendant failed to present the district court with any basis upon which it could suppress any of the statements made during the station house interview.
 
 
 95
 In-Court Identification of Defendant by Bank Employee
 
 
 96
 Waletzki argues in his pro se brief that his rights to due process were violated when the district court permitted the government to recall a bank employee, Julie Johnson. Apparently after Johnson had finished testifying the previous day, she informed the prosecutor that she could in fact identify defendant as the bank robber.
 
 
 97
 The evidence was sufficiently reliable to reach the jury. A court reviews an identification procedure to determine if it was unnecessarily suggestive and, if it was, whether the totality of the circumstances establishes that the identification was reliable despite its suggestiveness. Killebrew v. Endicott, 992 F.2d 600, 664 (7th Cir.1993). The credibility of an in-court identification is a jury question. United States v. Allen, 930 F.2d 1270, 1273 (7th Cir.1991). See also United States v. Larkin, 978 F.2d 964, 970 (7th Cir.1992). Johnson had a sufficient opportunity to view the bank robber at the time of the crime (4 to 5 minutes in good light, and she was standing close to and speaking directly with him, could hear his voice clearly, and despite the mask could see his build, eyes, and coloring). Johnson's degree of attention was at least fair. She certainly appeared to pay close attention to his demands and instructions. Despite being upset, she functioned well, asking the robber for additional direction, such as whether he wanted small bills or wanted her to help the tellers collect the money. And her prior description of the robber was somewhat accurate.
 
 
 98
 Although the length of time between the trial and the crime was about 18 months, this delay is not necessarily determinative where the witness had a sufficient opportunity to view the robber closely for a significant amount of time under good lighting, and was playing close attention. See United States v. Larkin, 978 F.2d 964, 970 (7th Cir.1992) (26 months between crime and identification). Finally, Johnson's level of certainty appeared to be high, though the jury was entitled to wonder why she did not identify defendant as the robber when she first testified. We hold that no due process violation occurred when the district court permitted Johnson to make an in-court identification of defendant.
 
 Erroneously-Read Jury Instruction
 
 99
 Waletzki argues that it was reversible error when the district court judge misread a jury instruction regarding the effect of the evidence (introduced by defendant himself) that he had nine years earlier been convicted of bank robbery. The district court told the jury:
 
 
 100
 Evidence that the defendant has been convicted of a crime is to be considered by you only insofar as it may affect his credibility as a witness. It must be considered by you as evidence of guilt of the crime for which he is on trial. (Emphasis added.)
 
 
 101
 The government concedes that the district court misread the instruction. We review for plain error, which would require a mistake "so serious that but for it, the defendant probably would have been acquitted." United States v. Remsza, 77 F.3d 1039, 1044 (7th Cir.1996) (citations omitted). The error must "seriously affect[ ] the fairness, integrity, or public reputation" of the judicial process. Id. In reviewing jury instructions, "the question of whether a jury has been properly instructed is to be determined not upon consideration of a single paragraph, sentence, phrase or word, but upon the charge as a whole." United States v. Doerr, 886 F.2d 944, 960 (7th Cir.1989).
 
 
 102
 The evidence against Waletzki was overwhelming. For example, ballistics testimony indicated that the gun Waletzki was arrested with in Minneapolis was the same gun fired by the bank robber. Cameron testified that defendant had planned and carried out the bank robbery. She also identified defendant from the photographs taken by the bank's video camera during the robbery. And bait money from the $5,000 given to her by defendant was traced to the robbery. Her testimony was further corroborated by her mother's testimony, and by records showing numerous telephone calls between Cameron in Minnesota and several motels in Madison where defendant stayed under assumed names just before and after the bank robbery.
 
 
 103
 Moreover, records of a Madison motel revealed that the red Pontiac Trans Am rented by Cameron (with Waletzki listed as a second driver) was used by a person registered at the motel on the day of the robbery. An employee of the motel reported that his license plates had been stripped from his car while he was working. Those same license plates were seen on a red Pontiac Trans Am driven by the bank robber as he left the bank.
 
 
 104
 Incredibly, the evidence offered by defendant on his own behalf probably convinced the jury further that the evidence against him was overwhelming. For example, he told the jury that "this doesn't look real good for me, I see that." Waletzki later called on his own behalf an eyewitness to the robbery, who promptly identified Waletzki as the bank robber.
 
 
 105
 DEFENDANT: In your opinion is the bank robber as far as you know in this courtroom today?
 
 
 106
 A I think so, sir.
 
 
 107
 Q And who is that?
 
 
 108
 A That will be you.
 
 
 109
 Waletzki further enlightened the jury by presenting three witnesses who could not provide an alibi for him, and he explained to the jury this was proof that he had "evidence to show that I made a diligent effort to locate my alibi, which I intend [sic] that I had one...."
 
 
 110
 Defendant also imprudently argued to the jury that he had fully intended to commit crimes--just not a bank robbery. He testified on his own behalf that although Cameron wanted the pair to be "like Bonnie and Clyde," he preferred to do "something that was using your mind," and he suggested that they pull "a credit card scam." He testified: "That's what I was more thinking about. I knew it was less time if you got caught and it was something that was using your mind and that's something that I wanted to do, and nothing came of that either."
 
 
 111
 Given the overwhelming evidence of guilt before the jury, including the pro se defendant's repeated undermining of his own case,[4] we conclude that the misread instruction error did not affect the outcome of the trial, and no plain error occurred.
 
 Shackles at Pre-Trial Evidentiary Hearing
 
 112
 Defendant argues in his pro se brief that the magistrate judge abused his discretion in granting the government's request that defendant wear handcuffs (in front) and leg shackles during a pre-trial evidentiary hearing. Defendant argues that the restraints "affected his self-esteem," that he became "self-conscious" and was unable to "effectively question witnesses" or testify in a credible manner himself, and he "forgot entire lines of questioning." As a result, he was "unable to effectively conduct his defense." He concludes that "there would not have been a trial had [he] not been so restrained." At the time, however, defendant expressly informed the magistrate judge that the cuffs did not significantly hamper him: "[I]t doesn't seem to stop me from doing much of anything. They are a little hard to write with. That is about it." In addition, Waletzki easily could have turned to stand-by counsel for assistance if he was experiencing difficulties representing himself due to the restraints. We find that the record contains nothing indicating that the restraints prevented defendant from adequately representing himself at the pretrial evidentiary hearing. And certainly there was no prejudice, since no jurors were present.
 
 Conclusion
 
 113
 For the reasons stated, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Notably, we do not inquire as to whether, on the basis of probable cause, the Minneapolis police could have obtained a warrant. "Notwithstanding the Court's acceptance of the inevitable discovery doctrine, it makes no sense whatsoever to take the substantially broader step of suggesting that a violation of the Fourth Amendment may be disregarded simply because the police, had they thought about the situation more carefully, could have come up with a lawful means of achieving their desired results." Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.4 (3d ed.1996) text accompanying fn. 303-304 (footnotes omitted)
 
 
 [2]
 In keeping with his loquacious nature, Waletzki did offer the self-scrutinizing observation, in response to the information that the police had listened to the tape, that he had "fucked up" and that he was "so stupid I shouldn't be out," but the government did not attempt to introduce those statements into evidence at trial. Moreover, the statements were not such that they provided the police with additional information
 
 
 [3]
 It is approximately 266 miles from Minneapolis to Madison, so inquiring within a range of 580 miles (half of 1160; half of round-trip) of Minneapolis would obviously have reached Madison, Wisconsin
 
 
 [4]
 See John F. Decker, "The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self-Representation Twenty Years After Faretta," 6 Seton Hall Const. L.J. 483 (1996)