**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Burton FIALK, a/k/a John Staknis,**
**Defendant–Appellant.**

**No. 93–1098.**

United States Court of Appeals,
Seventh Circuit.

Argued June 4, 1993.

Decided Sept. 15, 1993.

Rehearing Denied Nov. 3, 1993.

Grant C. Johnson and Daniel P. Bach (argued), Asst. U.S. Attys., Office of the U.S. Atty., Madison, WI, for plaintiff-appellee.

David A. Geier (argued), Larowe & Gerlach, Madison, WI, for defendant-appellant.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

Marilyn Moore had disappeared—no one knew just how long—when officers from the Washburn County, Wisconsin, Sheriff's Department searched the house where she lived with John Staknis and arrested him for mur-

der.[1] Months later, the district attorney conceded that this search was unconstitutional; the trial judge suppressed most of the evidence against Staknis and dismissed the state's murder case. Shortly after Staknis' arrest for murder, the United States also began investigating him—for Social Security fraud. This case proceeded more successfully: he was convicted of making false statements under 18 U.S.C. § 1001 and 42 U.S.C. § 408(a)(7)(A), and sentenced to 27 months' imprisonment. Before his federal trial, Staknis moved to suppress the evidence on the grounds that it resulted from an unconstitutional search in the murder case. The district court denied his motion, reasoning that Staknis' Social Security fraud would have been discovered without any illegal search by the Washburn County deputies, and hence that the exclusionary rule did not apply. Staknis appeals this decision and we affirm.

The tangled events of this case began in September 1990 when hunters found the partially decomposed body of a woman in the woods near Cambridge, Minnesota. She had been dead about two months. The police made a clay reconstruction of her face and circulated flyers with her picture, but no one identified her. Several counties away in Wisconsin, Staknis and Moore shared a house in the town of Shell Lake. Our record does not recount how Washburn County authorities came to investigate Moore's disappearance over a year later, but in October 1991 they secured a warrant to search her and Staknis' home for "psychotropic drugs and other devices used to restrain or subjugate another person." The sheriff apparently suspected that Staknis had imprisoned Moore in their house. The searchers opened some unmarked red folders, read Staknis' diary (which hinted that he had killed someone), arrested him for Moore's murder, combed the area for her body—but found nothing. Staknis claimed that Moore ran away during a recent trip to Minneapolis, and that the diary's reference to killing only quoted from a book he had read. No one remembered seeing Moore since July 1991.

After Staknis' arrest, local papers ran stories about Moore's disappearance. These articles alerted a Social Security Administration (SSA) agent that Moore had been missing since July. Part of this agent's job was to check SSA files on missing persons and report possible misuse of their Social Security payments to the Inspector General's office in Madison, Wisconsin. Both Staknis and Moore received income from Social Security, and in September 1991 Staknis was still cashing Moore's checks as her "representative payee" despite her apparent disappearance. When a federal agent in Madison learned these facts, he contacted the Wisconsin Department of Justice for further information. Wisconsin had been assisting Washburn County in its murder case against Staknis. A state agent told the federal investigator that Staknis used the alias "Burton Fialk" and had two Social Security numbers. The investigator also learned that Staknis had an arrest record in Minnesota. Staknis' arrest report contained a letter to a "Harry Fialk" in New Jersey. Evidently the connection between Harry and Burton Fialk piqued the investigator's curiosity, because after trailing some blind leads and generally showing considerable persistence, the investigator discovered that Harry Fialk was Staknis' father. Harry had left "Burton" a $100,000 inheritance some years earlier, and Staknis had never reported this to SSA. On the basis of this information, he was charged with Social Security fraud in February 1992.

Also in early 1992, a Minnesotan passing through Shell Lake happened to see Moore's picture in a local paper. Our record does not explain why Moore was in the paper months after stories of her disappearance and Staknis' arrest first hit the press in October 1991; perhaps the traveller saw an old newspaper. In any event, the Minnesotan noticed that Moore resembled the unidentified woman whose likeness had appeared in Minnesota police flyers a year earlier. Again, the record does not say whether the traveller was a "missing persons" buff or merely possessed a remarkable memory for faces—but a dental records check confirmed that it was indeed

---

1. Defendant Fialk/Staknis has used the name Staknis for many years, and we will refer to him by the name he evidently prefers.

Moore's face that police had reconstructed after hunters found her body in September 1990. This chance discovery could have helped Wisconsin to prove its murder charges against Staknis—but by March 1992 the district attorney admitted that the seizure of Staknis' diary violated the Fourth Amendment and the state's case collapsed. The federal fraud case at issue today went to trial in June 1992.

■ Both Staknis and the government approach this appeal as an "inevitable discovery" case. In other words, they assume that the federal government acquired its evidence of Social Security fraud as a result of an unconstitutional search in the state murder case, and they argue about whether the evidence may be admitted under the exception to the exclusionary rule created by *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377. *Nix* allows courts to admit illegally obtained evidence that would have been discovered even without the illegal seizure. This begs a prior question, however, for the exclusionary rule does not apply to evidence that comes to light independently of an illegal search, *Murray v. United States*, 487 U.S. 533, 542, 108 S.Ct. 2529, 2535–36, 101 L.Ed.2d 472 or to evidence that is remote from the illegal police conduct. *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441.

Either the "independent source" or the "attenuation" doctrine, as the approaches just described are called, seems better fitted to this case than the "inevitable discovery" doctrine. The record can be read to suggest that federal investigators discovered evidence of Staknis' fraud independently of the illegal search in the state murder case. The government's failure to argue this position is mysterious until one comes across a statement made by the Assistant U.S. Attorney who prosecuted Staknis:

> It is not the government's position, while we are not clearly admitting the remaining allegations in the motion [to suppress], to defend those. We are not going to go point by point through the investigation in an attempt to show that we did not receive information from the search warrant and then show—attempt to show attenuation of

each item * * *. An easier approach * * * is to proceed under basically the theory of inevitable discovery which should make this fairly short and uncomplicated. 1 Tr. at 5–6. Since the government shirked its burden to argue independent source or attenuation, *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242, we must analyze this case as the government sought to prove it: as an inevitable discovery problem.

■ Under the inevitable discovery doctrine, illegally obtained evidence that is normally suppressed under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity. *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. *Nix* reviewed a case where police coaxed a defendant into revealing the location of a corpse after he had requested counsel. At the time of this illegal interrogation, however, search parties were close to the body. The Court held that physical evidence of the body need not be suppressed because it would have been discovered even without the illegal interrogation. Since the exclusionary rule sought to ensure that the prosecution was not put in a better position as a result of police misconduct, the purposes behind the rule were not served by excluding evidence that would have come to light without any misconduct. *Id.* at 443, 104 S.Ct. at 2508–09. The question before us is whether *Nix* applies to this case.

■ Staknis argues that all the evidence supporting his Social Security conviction resulted from the illegal seizure of his diary: without the illegal search he would not have been arrested; without the arrest there would have been no newspaper accounts of Moore's disappearance; without the publicity SSA would not have begun its investigation. Staknis emphasizes that the government learned of his alias "Burton Fialk" directly from the Wisconsin murder investigation. This fact prompted the government to trace the letter from Harry Fialk in Staknis' arrest record, which in turn led to the discovery of his unreported inheritance. The government argues in response that Moore's body would have been identified without any illegal search; local papers would have reported her

death; SSA would have begun an investigation; standard FBI checks would have revealed Staknis' alias; and thus evidence of Staknis' inheritance would have been discovered without the illegal search in the murder case. The district court adopted the government's view and found that *Nix* shielded the fraud evidence from the exclusionary rule.

Applying *Nix*'s exception to the exclusionary rule requires a two-part inquiry. First we must determine what events or evidence led to Staknis' conviction, and then we must decide whether that evidence would have been discovered without the unlawful search in the state murder case. *United States v. Buchanan*, 910 F.2d 1571, 1573 (7th Cir.1990). Here two pieces of evidence were critical to the fraud investigation: SSA had to learn that Moore was missing, or it never would have inquired about the fate of her checks; and the federal investigator had to learn that Staknis used the alias "Burton Fialk"—or he might never have traced the letter from Harry Fialk in Staknis' arrest record and discovered the inheritance.

The more difficult question is whether SSA would have learned of Moore's disappearance without being prompted by the news reports that followed Staknis' arrest. The government asserts that Moore's remains would inevitably have been identified in February 1992, and that SSA would have read reports of her death and begun its fraud investigation even if the illegal murder arrest had never occurred. This stretches *Nix* beyond plausibility. Moore's anonymous remains languished in Minnesota for eighteen months. They were identified in February 1992 only because an itinerant Minnesotan saw Moore's picture in a Wisconsin paper and somehow noticed her resemblance to a clay likeness that had appeared in Minnesota police flyers a year earlier! Moore's identification was so improbable that it cannot be called "inevitable" under hypothetical circumstances.

This does not defeat the government's case, however. An SSA agent testified that he routinely reported missing Social Security recipients to the Inspector General in Madison for possible fraud investigations. 1 Tr. at 10. If the October 1991 search by the Washburn County deputies had been entirely lawful, it still would have disclosed that Moore had disappeared. "Missing person" was the critical datum that launched an SSA inquiry by suggesting that Staknis had misappropriated Moore's checks. The illegal seizure of the diaries identified him as a murder suspect, but this misfortune did not make it more likely that he had committed Social Security fraud. Staknis did not need to become a murder suspect to inspire SSA's curiosity, he only needed to cash a missing person's checks. For this reason, the government met its burden—albeit tacitly—to show that SSA would have investigated Staknis even if the illegal seizure of his diary had never occurred. *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509.

The remaining evidence of Staknis' fraud also would have been discovered without the illegal actions of the local police. Here the government pursued a diligent investigation independently of the state's murder case. It would have learned of Staknis' alias without help from the state authorities because the FBI had this information, and federal investigators would contact the FBI as a routine part of their Social Security inquiry. 1 Tr. at 46–52. We thus agree with the district court that the evidence of Staknis' fraud would have come to light without any illegal police activity and that applying the exclusionary rule here "would put the police in a worse position than they would have been absent any error or violation." *Nix*, 467 U.S. at 443, 104 S.Ct. at 2509. This is not the purpose of the exclusionary rule, *Murray*, 487 U.S. at 541, 108 S.Ct. at 2535, and the district court properly denied Staknis' motion to suppress.

AFFIRMED.