# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2452

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Craig Allen Thomas, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: April 22, 2008
Filed: May 5, 2008

_____

Before BYE, COLLOTON, and BENTON, Circuit Judges.

_____

BYE, Circuit Judge.

Craig Allen Thomas appeals his conviction for possessing with intent to distribute fifty grams or more of crack cocaine as well as the 250-month sentence he received. We initially affirmed Thomas's conviction and sentence. Thomas filed a petition for writ of certiorari with the Supreme Court which was granted; the Supreme Court vacated our judgment and remanded the case to us for further consideration because of Kimbrough v. United States, 552 U.S. ___, 128 S. Ct. 558 (2007). As a result we vacated our original opinion and requested the parties to submit supplemental briefs addressing Kimbrough. After considering the supplemental briefing, we again affirm Thomas's conviction, but reverse and remand for resentencing.

# I

On May 23, 2005, the Cedar Rapids, Iowa, Police Department (CRPD) received word from the Chicago Police Department about Markell Lane, a suspect in a shooting death which had occurred in Chicago the day before, could be on his way to Cedar Rapids on a particular bus.

Three CRPD officers met the bus upon its arrival in Cedar Rapids. Among others, two African-American males not matching Lane's description exited the bus, and were not stopped. Thomas then exited the bus. Officers decided he matched a photograph they had of Lane. They approached Thomas and handcuffed him, then performed a pat-down search. An officer felt a metal object and what he believed to be a large bundle of currency in Thomas's front pants pockets, and left them where they were. He also found some paperwork in Thomas's back left pocket, which he left there.

Thomas told officers his name was Donnell Thomas (actually his brother's name) and said he did not have any identification. He said he was unemployed and did not know his Social Security number. He gave his address as being in an affluent Chicago suburb of Country Club Hills, Illinois.

The officers did not believe him. They asked Thomas if he had any relatives they could contact to confirm his identity. He gave a phone number but no name for his mother in Chicago and said his brother, Craig Thomas, also lived in Chicago. Thomas then denied consent for officers to search his person and his bag. An officer reached into Thomas's back pocket, however, and pulled out a bus ticket assigned to "Thomas, C." The district court held this to be an illegal search, but declined to suppress the evidence, citing the inevitable discovery doctrine.

Officers ran a search on both Craig and Donnell Thomas's names, and discovered the description of Donnell Thomas did not match the man they had handcuffed, and that a warrant was outstanding for Craig Thomas's arrest.

A plan was hatched by one officer, who walked away from Thomas while another officer remained with him. The officer who walked away called out "Craig!" and Thomas "snapped [his] neck towards our direction looking at us, acknowledging the word 'Craig,'" the officer testified. After being confronted with his reaction, Thomas admitted he was indeed Craig and had a warrant outstanding. He was then arrested on the warrant and for providing false information to a police officer.

Incident to the arrest, officers subsequently searched Thomas and his bag, and found two tin-foil wrapped objects in a pair of brown shoes. Though they looked like baked potatoes, they turned out to be 241.8 grams of crack cocaine. Officers testified the encounter took about ten minutes.

Thomas was charged with possession with the intention of distributing 50 grams or more of crack cocaine. At a suppression hearing, his testimony was at odds with police officers'. He said his head did not snap around when the officer called out "Craig!" Instead, he testified about turning to the other officer and asked, "What did he say?" He said he was detained for an hour before his Miranda rights were read to him. He also said officers brought a drug-sniffing dog to the scene; officers denied doing so (though one of the police units dispatched to the scene was indeed a K-9 unit).

At sentencing, the district court, citing Thomas's testimony, gave him a two-level enhancement for obstruction of justice, holding his statements material to the defense theory he was putting forward – that it was a racially motivated stop in search of drugs. "[D]efendant's false statements were made in an attempt to put some flesh on that bald assertion," the district court held. "He made statements about the

circumstances of the offense that, if believed, could have resulted in the suppression of the evidence, and so nothing could be more material than that."

Thomas's sentencing guideline range was 236 to 293 months, and he was sentenced to 250 months, with five years of supervised release.

II

This court reviews the district court's factual findings for clear error, and its application of law and the sentencing guidelines *de novo.*

Thomas argues officers knew early on he was not murder suspect Markell Lane and had no reason to hold him for further questions on an unrelated matter. The evidence does not support this argument.

When they stopped Thomas, the police officers were at the bus station to look for Lane on a bus from Chicago. He resembled the photograph they had of Lane, giving police both good reason to believe Thomas might be Lane, and good reason to handcuff him. Police are authorized to use handcuffs in making <u>Terry</u> stops. <u>United States v. Miller</u>, 974 F.2d 953, 957 (8th Cir. 1992).

Though the search of Thomas's pocket was improper, the evidence found need not be suppressed if the two prongs of the inevitable discovery doctrine are proved by a preponderance of the evidence: (1) there is a reasonable probability the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation. <u>United States v. Glenn</u>, 152 F.3d 1047, 1049 (8th Cir. 1998).

We find the discovery of the evidence on the ticket – the name "Thomas, C." – was inevitable. The officers were trying to determine whether they had a murder suspect on their hands. The "substantial, alternative line of investigation" the officers were conducting was whether the man they were speaking to was Lane; the stop could not be concluded until police discovered Thomas's true identity. This is a permissible reason to continue a Terry stop. "A brief stop of a suspicious individual, in order to determine his identity . . . may be most reasonable in light of the facts known to the officer at the time." Adams v. Williams, 407 U.S. 142, 145-46 (1972); Terry v. Ohio, 392 U.S. 1 (1968).

Before the improper search of his pocket, Thomas had told officers his first name was "Donnell." After he was unable to give them his Social Security number and did give them an address they believed unlikely to be his – and after a check on "Donnell Thomas" returned a description he did not match – police had good reason to believe he was not Donnell Thomas. The other name he had mentioned to officers was his own, giving officers some reason to think he was, instead, Craig Thomas. But until they could confirm such, officers had no firm reason to believe he was not Lane.

When Thomas turned his head to look at the officers who yelled "Craig!" he gave them reason to believe he was indeed not Lane. Unfortunately for him, at that same moment he also gave them reason to arrest him lawfully as Craig Thomas on an outstanding warrant and search him incident to that arrest.

Thomas's argument about the stop being racially motivated is also not supported by the evidence. Officers had in hand a photograph of an African-American male and did not stop several other African-American males who were on the bus from Chicago. The district court found Thomas did indeed resemble the photograph of Lane the officers had in hand. Only when he exited the bus did police make their first stop.

As to the obstruction of justice enhancement, the district court based its determination on the pre-sentence report, which listed three areas in which the probation officer found Thomas lied at his suppression hearing when he testified: (1) he turned to another officer with a question, and not toward the officer who called his name; (2) he was detained for an hour without being Mirandized; and (3) police had a drug-sniffing dog along on their search.

Thomas also testified he was not aware drugs were in his bag, and the drugs were not his. The district court found those statements to be false, but declined to make them part of her obstruction calculation because they went to the ultimate issue of guilt versus innocence.

The sentencing guidelines allow for an obstruction of justice enhancement if a district court finds by the preponderance of the evidence the defendant willfully obstructed or impeded the administration of justice during the investigation, prosecution, or sentencing. United States v. Molina, 172 F.3d 1048, 1058 (8th Cir. 1999). The application notes to the guidelines list providing materially false information to a judge or magistrate as conduct constituting obstruction of justice.

The suppression hearing was before the district court who sentenced Thomas; she was in a good position to evaluate the truthfulness and materiality of his testimony. While the district court dealt him quite a heavy blow when it levied the obstruction enhancement, it cannot be said it committed clear error in finding he perjured himself materially at the suppression hearing. See, e.g., United States v. Carter, 884 F.2d 368, 375 (8th Cir. 1989) ("[I]t is axiomatic that, although we might have decided differently in the first instance, we will not substitute our judgment for that of the district court absent a finding of clear error, and we do not so find").

III

At sentencing, Thomas asked the district court to vary downward from the advisory guideline range of 236 to 293 months arguing the guidelines' 100:1 ratio between crack and powder cocaine has an unjust effect on crack cocaine offenders.[1] The district court declined to vary from the advisory guideline range, stating a sentence within the guideline range was a reasonable sentence without specifically commenting on the request for a downward variance.

In Kimbrough, the Supreme Court held sentencing courts may vary downward from the advisory guidelines because of the disparity created by the 100:1 ratio between crack and powder cocaine offenses. 128 S. Ct. at 575-76. We cannot tell from the sentencing record in this case whether the district court would have granted Thomas's request for a downward variance if the district court had known it could do so. Under such circumstances, a remand for resentencing is appropriate. See United States v. Roberson, 517 F.3d 990, 995 (8th Cir. 2008) (remanding for resentencing when it was "unclear whether the district court declined to use its discretion in the requested manner because of then-current Eighth Circuit precedent or because it did not find that the disparity warranted any variance from the guidelines").

IV

The district court did not err when it admitted evidence gained from the Terry stop of Thomas. We therefore affirm his conviction. We also conclude the district court did not clearly err when it sentenced him with an enhancement for obstruction

---

[1]The 100:1 ratio between crack and powder cocaine offenses, contained within the guidelines in effect the time of Thomas's sentencing, has subsequently been retroactively modified by an amendment to the guidelines. The base offense level assigned to each threshold quantity of crack cocaine is now two levels lower. See U.S. Sentencing Guidelines Manual, Amend. 706, app. C (2007).

of justice. We reverse and remand for resentencing in order for the district court to consider Thomas's request for a downward variance.

COLLOTON, Circuit Judge, with whom BENTON, Circuit Judge, joins, concurring.

I concur in Judge Bye's opinion affirming Craig Allen Thomas's conviction and remanding the case for resentencing. In particular, with respect to the conviction, I concur that the district court properly applied circuit precedent concerning the "inevitable discovery doctrine" to the facts of this case. The discussion of that doctrine, however, provides an opportunity to observe that our court's present articulation of the inevitable discovery doctrine is inconsistent with Supreme Court precedent and warrants consideration at an appropriate time by the en banc court.

In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court adopted the ultimate or inevitable discovery exception to the exclusionary rule. The Court held that where information is discovered after police violate the Fourth Amendment, the evidence should not be suppressed "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id*. at 444. The rationale for this inevitable discovery exception, like the related independent source doctrine, is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Id*. at 443.

Since then, our court has said that the inevitable discovery exception to the exclusionary rule applies only where the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the

time of the constitutional violation." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997). This two-pronged test was adopted from decisions of the Fifth Circuit, *see United States v. Wilson*, 36 F.3d 1298, 1304 (5th Cir. 1994) (citing *United States v. Cherry*, 759 F.2d 1196, 1205-06 (5th Cir. 1985)), with no analysis of the competing approaches to the doctrine or whether Fifth Circuit's approach is consistent with *Nix v. Williams*.

Our court's present approach is both overinclusive and underinclusive. The first prong of the analysis is overinclusive. It provides that evidence is admissible if the government proves by a preponderance of the evidence that there is merely a "reasonable probability" that the disputed evidence would have been discovered by lawful means. The Supreme Court, however, held that a preponderance of the evidence must show that the evidence "ultimately or inevitably *would have been* discovered." *Nix*, 467 U.S. at 444 (emphasis added). "Reasonable probability" means something less than "more likely than not." *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995). By diluting the Supreme Court's standard – "would have been discovered" – to a "reasonable probability that the evidence would have been discovered," we open the possibility that police will be in a *better* position as a result of police error or misconduct.

Subsequent to *Nix*, the Supreme Court has reiterated that "inevitable discovery of illegally seized evidence must be shown to have been more likely than not." *Bourjaily v. United States*, 483 U.S. 171, 176 (1987). The Second Circuit, interpreting *Nix*, has concluded that "the government cannot prevail under the inevitable discovery doctrine merely by establishing that it is more probable than not that the disputed evidence would have been obtained without the constitutional violation." *United States v. Heath*, 455 F.3d 52, 58 (2d Cir. 2006). That court has found "semantic problems in using the preponderance of the evidence standard to prove inevitability," *id*. at 59 n.6 (internal quotation omitted), and two of Yale Law School's most distinguished professors have yet to solve this "semantic puzzle," other than to

observe that there is a difference between proving that something "would have happened" and that something "would inevitably have happened." *United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir. 1995) (Winter, J.); *Heath*, 455 F.3d at 59 n.6 (Calabresi, J.). This analysis arguably overlooks the fact that the Supreme Court spoke of evidence that "*ultimately or* inevitably would have been discovered," *Nix*, 467 U.S. at 444 (emphasis added), and there may be no difference between proving that something "would have happened" and that something "ultimately would have happened." In any event, whether the proper standard is "more likely than not" or some higher degree of certainty, suffice it to say for present purposes that a "reasonable probability" standard is inconsistent with *Nix* and should be eliminated from our court's formulation. *See Heath*, 455 F.3d at 60.

The second prong of our court's analysis, on the other hand, is underinclusive. A rule that the inevitable discovery doctrine applies only where "the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation," *Conner*, 127 F.3d at 667, allows for the exclusion of evidence that inevitably would have been discovered. Even if the police were not actively pursuing an alternative line of investigation at the time of police error or misconduct, for example, the government may well be able to establish that the execution of routine police procedure or practice inevitably would have resulted in discovery of disputed evidence. By requiring proof that a "substantial, alternative line of investigation" was in progress, our court's application of the doctrine contravenes the command of *Nix* that police should not be placed in a *worse* position than they would have occupied in the absence of error or misconduct. 467 U.S. at 444. The existence of an alternative line of investigation may be strong proof, as in *Nix*, that supports a finding that evidence inevitably would have been discovered in a particular case. But a rigid requirement that such proof be mustered in every case is an inappropriate prophylactic rule that unduly expands the exclusionary rule. *Cf. Murray v. United States*, 487 U.S. 533, 540 n.2 (1988) (rejecting prophylactic exception to independent source rule).

Most courts of appeals have expressly or implicitly rejected the "substantial, alternative line of investigation" requirement. *See United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998); *United States v. Larsen*, 127 F.3d 984, 987 (10th Cir. 1997); *United States v. Kennedy*, 61 F.3d 494, 499-500 (6th Cir. 1995); *United States v. Fialk*, 5 F.3d 250, 253 (7th Cir. 1993); *United States v. Thomas*, 955 F.2d 207, 210 (4th Cir. 1992); *United States v. Boatwright*, 822 F.2d 862, 864 (9th Cir. 1987) (Kennedy, J.); *United States v. Silvestri*, 787 F.2d 736, 745-46 (1st Cir. 1986). That prophylactic rule is now followed by only our court, the Eleventh Circuit, and the Fifth Circuit, from which both we and the Eleventh Circuit adopted it. *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004); *Conner*, 127 F.3d at 667; *United States v. Kirk*, 111 F.3d 390, 392 (5th Cir. 1997). We should align ourselves with the majority of circuits and abandon this unwarranted requirement.

Because I agree that the district court properly applied our governing precedent regarding the inevitable discovery doctrine to the facts of this case, I concur in the opinion of the court affirming Thomas's conviction, as well as the remand for resentencing. The district court's order, moreover, includes a determination that the disputed evidence was admissible under what I believe to be the correct standard: "In sum, because it was inevitable that Defendant's true identity *would have been discovered*, there is no need to suppress this evidence." *United States v. Thomas*, No. 05-0055, Order Regarding Defendant's Motion to Suppress, at 15 (N.D. Iowa Aug. 8, 2005) (emphasis added). I do not believe, therefore, that an adjustment of our court's approach to the inevitable discovery doctrine would change the result in this case.