# District of Columbia
# Court of Appeals

**Nos. 12-CO-1663 & 12-CF-1665**



OCT - 6 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

ALLEN J. LOGAN, JR.,

                                Appellant,

    v.                                          **FEL-3853-02**

UNITED STATES,

                                Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: WASHINGTON, *Chief Judge*; GLICKMAN, *Associate Judge*; and BELSON, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgments of conviction appealed from are hereby affirmed.

                                  For the Court:

                                  JULIO A. CASTILLO
                                  Clerk of the Court

Dated: October 6, 2016.

Opinion by Senior Judge James A. Belson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CO-1663 & 12-CF-1665

ALLEN J. LOGAN, JR., APPELLANT,

FILED 10/6/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

v.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(FEL-3853-02)

(Hon. Rufus G. King, III, Trial Judge)
(Hon. Neal E. Kravitz, Motions Judge)

(Argued September 29, 2015                    Decided October 6, 2016)

*Richard S. Stolker* for appellant.

*John V. Geise*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *Charles W. Cobb*, and *Glenn L. Kirschner*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, GLICKMAN, *Associate Judge*, and BELSON, *Senior Judge*.

BELSON, *Senior Judge*: A jury convicted appellant of: (1) armed burglary;[1] (2) assault with the intent to kill while armed;[2] (3) aggravated assault while armed;[3] (4) second degree murder while armed of Simona Druyard;[4] and (5) first degree murder while armed of Mika Washington.[5] Appellant's first trial, held before the Honorable John Bayly, ended in a mistrial. He was convicted in his second trial, which was before Chief Judge Rufus King. Appellant appeals his convictions and sentences, as well as the denial of his motion to vacate sentences brought pursuant to D.C. Code § 23-110 (2012 Repl.). For the reasons stated below, we affirm.

## I.

The government's evidence showed that appellant had entered into an informal agreement with Amin Washington, in which Washington promised to invest many millions of dollars into appellant's planned restaurant/nightclub project, Platinum World. Appellant had met Washington in February 2002 at the

---

[1] D.C. Code §§ 22-1801(a), -3202 (2001).

[2] D.C. Code §§ 22-501, -3202 (2001).

[3] Id.

[4] D.C. Code §§ 22-2402, -2403, -3202 (2001).

[5] D.C. Code §§ 22-2402, -3202 (2001).

office of appellant's attorney, Gary Williams. Washington had earlier told Williams that he had millions of dollars overseas, but that there was a problem regarding its being transferred to the United States. This claim of wealth seemed doubtful to Williams, who had never seen any documentation showing that it existed. It was also inconsistent with the lifestyle of Washington, who lived with his wife and two children in a single room in a rooming house. Appellant discussed his plan for Platinum World with Washington soon after they met at Williams's office, and he secured Washington's agreement to invest millions of dollars in the project. There were several times before June of 2002 when they were supposed to meet and execute the necessary documents but did not because the promised money had not yet arrived from overseas. Finally, June 14, 2002, was chosen as the date upon which appellant and Washington would meet and execute the documents necessary to enable appellant to use Washington's money, which by then was to have arrived, to carry the plan forward. On that afternoon, appellant received a phone call from Washington who indicated that he was not able to provide the long-awaited funds. Appellant became very upset and was described by his girlfriend, Patrice McFarlane, as "crying," "sobbing," and in a "rage."

After appellant received the phone call, a friend, Joshua Thompson, drove him to 1119 Montello Avenue, Northeast, where Washington lived with his family, including his two year-old son, Mika Washington. Appellant and Washington arrived at the same time, and Washington's landlady, 80 year-old Simona Druyard, let them in.

Once inside the house, Washington leaned over to get his briefcase, whereupon appellant, who had worked as a barber, grabbed him from behind and cut his throat with a sharp object. When appellant briefly stepped away, Washington got behind a partially-glass door. Appellant broke the glass and wounded Washington, near his eye and on the back of his hand, with a sharp object. Washington was then able to barricade himself in an adjacent room whereupon appellant said "[c]ome out or I'll kill your son." Washington, who was panicking, in pain, and bleeding heavily, did nothing at first. After a while, he came out to find Mika lying on the porch floor and as he picked him up, he "was trying to keep [Mika's] head on." Ms. Druyard was found in the living room, her throat deeply slit. Washington also witnessed appellant "going over the [back] gate."

Ms. Druyard died as a result of an incised wound in her neck through her trachea and major blood vessels. Mika had a cut across his throat, from "one ear to the other" that cut through his air pipe, food pipe and the muscles to the right of the spine. Immediately after the incident, appellant called a friend, Alison Henderson, and asked for money as well as a place to stay. He also told her that he had "made some bad decisions."

At trial, appellant sought to prove that he and Washington had argued, that appellant had picked up Mika in order to protect himself, and that Washington cut his son while trying to cut appellant with a knife.

### The Search of Appellant's Cell Phone

At about 6 p.m. on June 14, 2002, appellant was detained as the result of police investigation into the killings, and his cell phone was taken incident to his arrest. The following day, June 15, 2002, a lawful search of appellant's home was conducted pursuant to a search warrant. In the process of conducting the search, Officer Garvey spoke to two witnesses who stated they had observed appellant speaking on the phone on the afternoon of the murders and that after the phone call appellant's mood changed from being "relaxed" to being "enraged." In light of

this information, Officer Garvey proceeded to search appellant's cell phone for calls made, and was careful to note the information because, he said, he was concerned the data would be lost. Information obtained from the search of the cell phone identified two witnesses: Joshua Thompson, the friend who drove appellant to Washington's home and Patrice McFarlane, appellant's girlfriend.[6]

## II.

Appellant appeals his convictions, arguing that (1) the trial court erred in refusing to suppress the testimony of the three witnesses discovered by means of an illegal, warrantless, search of appellant's cell phone, and (2) the trial court erred in admitting photographs of the victims that were more prejudicial than probative. Appellant also appeals the trial court's denial of his motion to vacate, set aside, or correct his sentence under D.C. Code § 23-110 because his standby counsel at trial had a conflict of interest and also interfered with his right to represent himself.

### A. The Search of the Cell Phone

---

[6] Appellant suggests in his brief that the identity of a third witness, Alison Henderson, was discovered by the search of his cell phone. However, Detective Garvey testified at trial that Henderson was identified *after* he received the subpoenaed phone records and not as a result of his search of the contents of the cell phone.

In reviewing a trial court's denial of a motion to suppress, "we view the facts and all reasonable inferences therefrom in the light most favorable to the government as the prevailing party, and we review the Superior Court judge's findings of fact only for clear error." *Towles v. United States*, 115 A.3d 1222, 1228 (D.C. 2015) (citing *Robinson v. United States*, 76 A.3d 329, 335 (D.C. 2013)). We review *de novo* the trial judge's conclusions of law. *Id.*

The Supreme Court recently held that a warrant is required in order to search a cell phone. *Riley v. California*, 134 S. Ct. 2473, 2485-87 (2014). The Court held that the search-incident-to-arrest exception to the warrant requirement does not apply in the case of cell phones; however, other case-specific exceptions, such as exigent circumstances, do apply. *Id.* The Court specifically rejected the argument that a cell phone search may be justified to prevent the destruction of evidence absent exigent circumstances. *Id.* at 2486-88. Therefore, Officer Garvey's concern that data might be lost did not justify a search under *Riley*, and there were no other exigent circumstances present to justify a warrantless search. *Accarino v. United States*, 85 U.S. App. D.C. 394, 402; 179 F.2d 456, 464 (1949) (exigent circumstances exception requires circumstances of an emergency that requires an immediate search, with no time to obtain a warrant). In this case, as appellant was already detained and the phone was in police possession, no emergency

necessitated a search of the phone. Therefore, absent another basis for the search of the phone, it would appear that the search was unlawful under *Riley*.

The United States argues that the inevitable discovery doctrine applies here, and allows admission of the evidence discovered from the cell phone even if the search was otherwise unlawful. We agree. Under the inevitable discovery doctrine, even when the police obtain evidence through unlawful conduct, the evidence may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Hicks v. United States*, 730 A.2d 657, 659 (D.C. 1999) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The purpose of the doctrine is to ensure that "the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." *Id*. at 661 (quoting *Nix*, *supra*, 467 U.S. at 443) (emphasis in original). The doctrine permits no speculation and must focus on demonstrated historical facts. *Nix*, *supra*, 467 U.S. at 444, n.5. We wrote in *Hicks* that "the lawful process which would have ended in the inevitable discovery [must] have . . . commenced before the constitutionally invalid seizure." *Hicks*, *supra*, 730 A.2d at 659 (quoting *Douglas-Bey v. United States*, 490 A.2d 1137, 1139 n.6 (D.C. 1985)) (bracketed term in original). *See*

*also Gore v. United States*, 2016 D.C. App. LEXIS 313 at *18 -*19 (D.C. Aug. 18, 2016).

The lawful process that, under the prior commencement approach, must begin before to the invalid seizure need not be a formal one.[7] Courts have frequently applied the inevitable discovery doctrine when an investigation of the defendant or of a suspected criminal activity (as contrasted to a formal legal process such as securing a search warrant) had been initiated prior to the illegality. *United States v. Brookins*, 614 F.2d 1037, 1040 (5th Cir. 1980) ("the police must show that when the illegality occurred they possessed and were actively pursuing the evidence or leads that would have led to the discovery of the challenged witness"); *see United States v. Thomas*, 524 F.3d 855, 858-59 (8th Cir. 2008) ("the government was actively pursuing a substantial, alternate line of investigation at the time of the constitutional violation"); *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004) (rape victim's identification of defendant's voice during an illegal stop admissible because before stop police had information that caused them to focus on defendant so victim would inevitably have heard his voice); *United*

---

[7] In *Douglas-Bey*, *supra*, the court found the inevitable discovered doctrine inapplicable because no lawful process, "i.e., on the facts of this case, an application for a search warrant" had been initiated. The court dealt with this issue briefly in a footnote and we do not take it to limit applicability of the inevitable discovery doctrine only to situations in which a *formal* lawful process had begun.

*States v. Terzado-Madruga*, 897 F.2d 1099, 1114-15 (11th Cir. 1990) (identification of witness admissible even though identity obtained by illegally recording a phone conversation because, at time of illegal recording, another member of conspiracy, who was already cooperating with police, was capable of identifying witness); *State v. Andersen*, 440 N.W.2d 203, 214 (1989) (names in illegally-obtained address book would have been obtained through routine investigation of pornography traffic ring); and *United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir. 1980) (records of travel agencies discovered as result of illegal search inevitably would have been discovered during ongoing investigation where police already aware of defendant's and wife's travel and their use of travel agency).

The inevitable discovery doctrine should not be applied under the prior investigation requirement, however, when an ongoing investigation is unrelated to the evidence illegally obtained, *see, e.g.*, *United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003) (defendant being investigated in relation to homicide when illegal search uncovered unrelated shotgun). It should also not be applied when the investigation had clearly ended prior to the illegal search. *United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003) (defendant already charged and investigation no longer active at time of illegal search).

In the case before us, appellant was detained at around 6 p.m. on Friday June 14, 2002. Later that evening, at around 11 p.m. or midnight, Detective Garvey was given appellant's cell phone, which had been seized incident to his arrest, but did not look through the contents. The following morning, at around 6:30 a.m., Garvey interviewed Washington at the hospital. Washington told Garvey that he had seen Logan prior to the stabbing with an individual by the name of Josh. Later that morning, officers arrived at appellant's residence, 1119 Montello Avenue, where they waited to receive a search warrant to search the premises. While waiting for the search warrant, Detective Kimberly Lawrence spoke to a couple who lived on the second floor of the house, Daphne Thomas and Andre Barnhart. They told her that when appellant had left home he "had stormed out of his room, and he was angry and he was saying stuff." The search warrant was granted sometime in the early afternoon. During the search, officers recovered appellant's billing records for that phone, which included the cell phone's number but not a detailed call history.

Detective Garvey arrived at appellant's residence later in the afternoon to help search the house. At appellant's home, Garvey interviewed Thomas and Barnhart who informed him that appellant "was on a phone call" at about 3 p.m. the day before and that "after he got the phone call, he became very enraged."

Prior to the phone call, they said appellant "was fine, calm, relaxed." After the search of appellant's apartment, Garvey went back to his office and, without a warrant, "looked into" the contents of appellant's phone. He "started writing down what calls came in . . . and the calls that Mr. Logan had made out using the phone." He also "look[ed] inside the phone book side of the phone" in order to match up the numbers "with the name[s]." Five days later, on June 20, 2002, a subpoena was issued for appellant's detailed phone records, including appellant's call history with the numbers Garvey obtained when he searched appellant's cell phone.

It is clear from the sequence of events that at the time Garvey searched appellant's cell phone an active investigation into the murders of Mika and Ms. Druyard was already underway and that appellant was a suspect. The police had reason to investigate a phone call made at 3 p.m. on the afternoon before the murders that caused appellant to become enraged. Furthermore, billing records already obtained during the authorized search of appellant's residence provided appellant's cell phone number, thus completing the gathering of information the police needed to apply for a subpoena of appellant's phone records. Detective Garvey testified that police protocol dictates that "in cases in which [police] learn[] . . . that a suspect had been using a cell phone . . . [they] issue a subpoena asking for cell phone records." This is sufficient to establish, by a preponderance

of the evidence, that appellant's cell phone records would inevitably have been obtained by lawful means and that the two witnesses Garvey contacted using information from appellant's cell phone, would inevitably have been discovered.

We need not decide here whether the language in *Douglas-Bey* and *Hicks* concerning prior commencement is binding on us under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), or instead can be considered dicta, as we are satisfied that there was a substantial concerted investigation of appellant's conduct underway before Officer Garvey checked the contents of the cell phone that satisfies a requirement of prior commencement. We add that in many jurisdictions it is not deemed necessary to establish that at the time of the search in question the government was actively pursuing the lawful process that would have led inevitably to discovery of the evidence.[8]

---

[8] *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014) (We do not "limit the inevitable discovery exception to lines of investigation that were already underway"); and *United States v. Kennedy*, 61 F.3d 494, 499-500 (6th Cir. 1995) ("[A]n alternate, independent line of investigation is not required for the inevitable discovery exception to apply"). *See also* concurring opinion in *Thomas*, *supra*, 524 F.3d at 862 ("Even if the police were not actively pursuing an alternative line of investigation at the time of police error . . . the government may well be able to establish [inevitable discovery]."). *See also* WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT 365-68 (5th ed. 2012), explaining that a prior commencement requirement "is unsound" as it excludes evidence that would inevitably have been discovered.

## B. Photographs of the Victims

This court reviews a trial court's ruling to admit autopsy photographs for abuse of discretion. *Strozier v. United States*, 991 A.2d 778, 783-84 (D.C. 2010). The evaluation and weighing of evidence for relevance and potential prejudice is entrusted to the sound discretion of the trial court. *Id*. at 784 (citation omitted). "The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed." *United States v. Rezaq*, 328 U.S. App. D.C. 297, 314; 134 F.3d 1121, 1138 (1998) (citations omitted).

In appellant's first trial, the government sought to admit several photographs of autopsies of the victims, but Judge Bayly allowed the admission of only one photograph. In appellant's second trial, the government sought to admit additional photographs of Mika Washington in order to demonstrate that appellant's version of how Mika had been killed was inconsistent with the injuries. Chief Judge King allowed the admission of the additional photographs.

Relevant evidence may be excluded only if "its probative value is substantially outweighed by the danger of unfair prejudice." *Johnson v. United States*, 683 A.2d 1087, 1099 (D.C. 1996) (en banc). "Autopsy photographs can have immense probative value if, for example, they confirm the prosecution's theory about the manner in which the crime was committed." *Rezaq*, *supra*, 328 U.S. App. D.C. at 314; 134 F.3d at 1138. Even when the manner of death is not contested, evidence can be relevant to show the nature of the injuries suffered. *Womack v. United States*, 339 A.2d 37, 38 (D.C. 1975).

In this case, Chief Judge King did not abuse his discretion when he determined that the danger of unfair prejudice did not substantially outweigh the photographs' probative value because "a fundamental issue in the case is whether these wounds are concave from the perspective of the attacker or convex" and the photographs served to support the prosecutor's case. The judge further noted that other photographs of the deceased had already been admitted and that this was "one of the bloodier cases [he had] seen" and the court could not escape the bloody nature of the crime. It is also significant to note that the photographs were taken in a clinical setting, thereby reducing their prejudicial effect. *Rezaq*, *supra*, 328 U.S. App. D.C. at 314; 134 F.3d at 1138. We find no abuse of discretion and uphold the decision of the trial judge to admit the photographs.

## III.

After trial, appellant filed a motion to vacate, set aside or correct his sentence pursuant to D.C. Code § 23-110 (2012 Repl.). Appellant argued that he received constitutionally ineffective assistance of counsel, citing several particulars to support his claim. Appellant further argued that there was a conflict of interest on the part of appellant's counsel that compromised his counsel's performance at trial. An evidentiary hearing was conducted over several days. On September 12, 2012, the trial court denied appellant's motion on all grounds.

Appellant appeals the trial court's ruling with respect to his § 23-110 motion on two grounds. Appellant argues that the trial court erred in determining that: (1) there was no actual conflict that disqualified appellant's trial counsel; and (2) appellant's standby counsel did not impair his right to represent himself at trial by preventing him from considering a plea offer, moving for a mistrial without his consent in the first trial, and stipulating to the testimony of two government witnesses without his approval. Appellant asserts that these errors denied him the right to represent himself as lead counsel during the trial.

In reviewing a trial court's ruling on an ineffective assistance of counsel claim, we accept the trial court's findings of fact unless they lack evidentiary support, and review legal conclusions *de novo*. *Turner v. United States*, 116 A.3d 894, 934 (D.C. 2015). A claim of ineffective assistance of counsel has two components. First, appellant must show that counsel's performance was deficient, i.e., "that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (cited in *Turner*, *supra*, 116 A.3d at 934). Second, appellant must show that the performance so prejudiced the defense "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* Having reviewed the trial court's factual findings and legal conclusions, we affirm the trial court's denial of appellant's § 23-110 motion.

## A. The Conflict of Interest

Appellant's attorney, Thomas Heslep, withdrew from representing appellant in October 2003. He then reentered the case in April 2004. Appellant's claim of ineffective assistance of conflicted counsel is based on three alleged conflicts:

> *First*, Heslep had previously defended appellant's cousin, Effeh Enoh, on an unrelated criminal charge. Heslep

received information from appellant regarding marijuana use in Enoh's home that Heslep used to support his defense strategy for defending Enoh. Appellant now claims that Enoh's mother, Denise Hall, was offended that appellant would have provided such information about her home, and, therefore, had incentive to testify against appellant. Ms. Hall was a government witness at appellant's trial;

*Second*, in 2004 appellant had lodged a complaint with Bar Counsel against Heslep alleging a conflict based on a disagreement over several *pro se* motions appellant had filed over Heslep's signature. Heslep subsequently withdrew those motions, contrary to appellant's wishes;

*Third*, Heslep was aware that on June 29, 2005, during a mental health evaluation, appellant said he had thoughts about harming his attorney.

Judge Kravitz considered each claim and concluded that no actual conflict existed. An attorney has an actual conflict of interest when, during the course of representation, the attorney's and the client's interests diverge with respect to material factual or legal issues or with respect to a course of action. *Veney v. United States*, 738 A.2d 1185, 1192-93 (D.C. 1999) (internal quotations and citations omitted). "An actual conflict of interest exists when a defense attorney is required to make choices advancing [one client's] interest to the detriment of [another's]." *Wages v. United States*, 952 A.2d 952, 960 (D.C. 2008) (internal quotations and citations omitted). Thus, we must consider whether there was such a conflict between representation of Enoh and representation of appellant.

Judge Kravitz appropriately considered the following facts: Heslep's role in Enoh's case was over by the time of his reappointment to appellant's case in 2004; appellant and his cousin were not co-defendants and their cases were not related; Ms. Hall had already testified to the grand jury in appellant's case before appellant provided Heslep with the information regarding marijuana use; there was no evidence to suggest that Ms. Hall became more favorable to the government and unfavorable to appellant because Heslep had told the government about evidence of marijuana in Ms. Hall's house; and by the time Heslep was reappointed, Ms. Hall had resumed a friendly and cooperative relationship with him. Based on these facts, we sustain the trial court's ruling that Heslep was not conflicted as a result of his representation of Enoh.

Regarding the complaint to Bar Counsel (now known as Disciplinary Counsel), this court has held that in cases where Bar Counsel has not initiated an investigation, the fact that a complaint has been made is not sufficient to show a conflict of interest. *Malede v. United States*, 767 A.2d 267, 271 (D.C. 2001) ("[W]e decline to hold that the bare filing of the disciplinary complaint created a conflict of interest necessitating [counsel's] discharge from the case."). In this case, Bar Counsel did not initiate an investigation, and Judge Kravitz appropriately found no conflict of interest.

Finally, regarding appellant's thoughts about harming Heslep, Judge Kravitz permissibly found that the threat was indirect and did not lead to a divergence in interests. *Veney*, *supra*, 738 A.2d at 1192-93. We, therefore, uphold the decision of the trial judge to reject appellant's claim that his counsel labored under a conflict of interest.

### B. Appellant's Right to Represent Himself

Appellant asserts that he was erroneously denied the right to represent himself as lead counsel. The crux of appellant's argument is that he was not given the opportunity to make certain decisions during his trial regarding the following: he was not permitted to accept or reject a plea offer made in 2005; a mistrial at his first trial was declared without his consent; and the testimony of two witnesses was stipulated without his consent. We will accept the trial court's findings of facts regarding these matters unless they lack evidentiary support, and review legal conclusions *de novo*. *Turner*, *supra*, 116 A.3d at 934.

A defendant has the right to self-representation, but a court may require standby counsel to aid the defendant. *Faretta v. California*, 422 U.S. 806, 819, 834 (1975). Often defendants wish to have standby counsel take a more active role

and, in such a case, a defendant cannot later claim to have been deprived of control over his own defense. *McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984).

In this case, appellant opted to remain lead counsel but have an active standby counsel. Judge Kravitz concluded, based on appellant's arrangement with Heslep, and on his finding that Heslep maintained an open line of communication with appellant and was respectful of appellant's role as lead counsel, that "Heslep never overrode [appellant's] view of what approach to the case was best." The trial judge credited Heslep's testimony that he and appellant had decided on a division of duties and that Heslep had discussed the plea bargain with appellant. Furthermore, at a preliminary hearing on June 30, 2005, in appellant's presence, Heslep had a conversation with the trial court regarding the government's plea offer, indicating that the "two sides are really not close" and appellant made no objection. Heslep testified that he and appellant discussed their trial strategy, deciding to request a mistrial if the jury remained deadlocked. Appellant was present in the courtroom when Heslep requested the mistrial on his behalf and made no objection.

At appellant's first trial, two government witnesses and one defense witness testified to being in the alley outside Washington's house immediately after the

attack and seeing appellant leave the house. For the second trial, the two government witnesses were unavailable and the defense stipulated to admission into evidence of their testimony in addition to the testimony of the defense witness. At the § 23-110 hearing, Heslep testified that he discussed the stipulation with appellant and that appellant had no objection. Heslep testified that he pursued this defense strategy because he was wary of placing the defense witness on the stand due to emotional issues she was having at that time.

Based on the foregoing evidence, the judge rejected appellant's claims that he did not agree to decisions made regarding the plea bargain, mistrial, or stipulation to admit prior witness testimony. The trial court's findings are supported by the evidence of record.

For the foregoing reasons, the judgments of conviction appealed from are hereby affirmed.

*So ordered.*